Matthew Miller, CUNY O'Gilbert & LaDuca, Washington, for Plaintiffs' Appellants. This case concerns the liability of an independent auditor for false and misleading financial statements issued by a Southern California bank between 2006 and 2008 inclusive. In 2010, the bank was seized by its regulators and shut down. The threshold question is, what is the requisite state of mind that applies to claims under Section 10B of the Exchange Act against an independent auditor? The district court held that the plaintiff must make a showing of subjective falsity. In other words, that the auditor knew that the financial statements were false and misleading, not merely recklessness, which is the general scienter standard applicable to claims under Section 10B of the Exchange Act. Don't you also have, even aside from the dispute about subjective falsity, tell me what you think scienter requires under these circumstances? Well, this Court's decision in the New Mexico State Investment Council case lays out the standard. It's, you know, it's the same standard that's applicable to other types of defendants, but in the context of an independent auditor, this Court has said it requires more than a misapplication of accounting principles. The plaintiffs must show that the accounting practices were so deficient that the audit amounted to no audit at all. Or an egregious refusal to see the obvious or to investigate the doubtful, or that accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts. And that's what this Court laid out in New Mexico State Investment Council. It doesn't seem like any of those are satisfied here. Well, I disagree, Your Honor. I can't hear you. Yeah, I'm sorry. I was away from the mic. I said it doesn't seem like any of those are satisfied here. So why don't you pick your easiest target of that list and let's talk about it. Which one do you think is the easiest to meet? The easiest would be an egregious refusal to see the obvious or to investigate the doubtful. Which one is it? An egregious refusal to see the obvious or to investigate the doubtful? Let me start the story where it ends. This is a bank that Judge Kuczynski asked you which of the two it was. So before you begin the story, tell us which of the two you think it was. I think it was close to no audit at all. Did they do an audit? Yes, they sampled loans here and there. But what they did was enough to realize that the company's constant You gave a choice between two things, which you laid out, and you picked the third thing. You said it's either If we have to pick one, I would say it's an egregious refusal to see the obvious. An egregious, okay, go ahead. Now tell your story and let's see where the egregious refusal to see the obvious is. Okay. The gravamen of our complaint is that this bank issued financial results for 2006 and 2007 that were its most profitable years ever, $38 million and $33 million in profits respectively. And in 2008, which was a horrible year for the banking industry, a relatively modest loss of $10 million. Where is the, and where the story ends in 2009 as the bank is seized by its regulators No, we know all that. Okay. We know the bank, they're really bad people or bad, bad bankers, one of the two, and we know they go under. Your suit is against the accountants for making a misrepresentation. That's right. And so tell me what, tell me what you have to show that in making that representation, they were, I think you showed egregious from the menu that judge Kaczynski gave you. I thought it was refusal to see the obvious. Okay. But one of those, tell me, tell me what facts you've pleaded to show that. What was the obvious that they refused to see? The obvious thing, going back to the beginning, starting in 2005 and 2006, the regulators were telling the bank and Deloitte noted this in its work papers that the company has over-concentrated in real estate loans and also that it had inadequate underwriting practices and generally internal controls. And starting in 2006, and it gets worse in 2007 and 2008, Deloitte does some sampling of the loans, but those samplings reveal terrible underwriting problems, and it doesn't even book adequate loan loss reserves for those loans, must let's extrapolate them onto the total portfolio. And the bank's reserves Focus on the representation that you think Deloitte made that was false. The representation that made this false was in setting the loan loss reserves. That's the key issue in this case. If the loan loss reserves had been set properly, this bank would not have. So your position is that they knew that the loan loss reserves that they set were inaccurate and nonetheless went ahead and did so with the requisites he entered. Is that your contention? Absolutely. At all times, this bank's reserves were lower than its peer institutions. The bank had been warned by regulators repeatedly. It was the subject of two cease and desist orders during the class period, in addition to many other admonitions from regulators. And what did the independent auditor do? It did nothing. The bank started increasing its loan loss reserves in 2008, but that was only after the regulators came in and told them to do that. Deloitte didn't do that on its own initiative. FRB didn't do that. In 2009, there was a cease and desist order. And later that year, the SEC told the bank to restate its financials. Deloitte didn't do that on its own initiative. Deloitte didn't find any of this. Maybe they're the world's worst auditors. You have to show more, don't you? They can't be that bad. KPMG, which is another big four accounting firm, found that the regulators lost $800 million, or the taxpayers lost $800 million, which is 40% of the bank's loan portfolio. And what is Deloitte doing for the last three years? Issuing clean financial opinions? But just don't read the argument for a minute, and let me just ask you a question, and you can respond to me. Your allegations in this case, as I read the complaint, are these guys were really terrible auditors. There's a bunch of stuff they should have seen. And since they didn't see it, we should be able to infer the requisite scienter. Do you have any allegations that go beyond that? We absolutely do. We talked about specific loans they saw and didn't book reserves for. I think I was just saying. There are many of them listed for every year, for 2006, for 2007, for 2008. We said they did samples. They looked at the samples. They found all kinds of problems, but didn't make FRB do anything. They still issued clean opinions. They still didn't make them increase their loan loss reserves. When they do finally book a $90 million restatement in 2009, it's only after the SEC came in and told them to do it. Let me ask you, please, just focus on this for a second. Sure. It's not a negligence case. It's a fraud case. And so let's assume for purposes of discussion on this complaint you've made out that they should go back to accounting school. They should lose their licenses. My question is, what allegations here make this such that it rises to the level of scienter? As if there were no audit at all, an egregious or one of whatever the choices Judge Kaczynski gave you, what allegations bring it to that level? Well, going in and looking at a sample of loans, finding egregious underwriting problems, finding impairment of collateral and questionable appraisals, and then not making the client do anything and saying, this is all okay. We're going to sign off on the financial statement and give you a clean opinion for three years in a row. And what happens at the end of that is the SEC and the FDIC have to mop everything up. And they're looking from the outside. They don't have all the information Deloitte has. Deloitte's on the inside. They're looking at these horrible loan files, a bank that had been warned by regulators for four years in a row that its management was inadequate, its board was inadequate, its underwriting was inadequate, it was over-concentrated in real estate. Every single year the regulators come and tell them this. And this is in Deloitte's files. Deloitte has its head stuck in the sand. This bank lost $800 million, 40% of its loan portfolio. And Deloitte had issued three clean opinions in a row. Two years earning over $30 million, another year with a $10 million loss. And then the bank takes a restatement and books the whole thing as if it happened in June of 2009 in one quarter. That's impossible. It makes no sense. Okay. I'll reserve my last minute and 20 seconds. Thank you, Your Honors. Your Honors, good morning. Peter Wald on behalf of the defendant and appellant Deloitte and Touche, LLP. Let me start with the question of the allowance, which my opponent has identified as the key issue in the case. Deloitte expressed audit opinions on three year-end financial statements, 2006, 2007, 2008. As set forth on page 14 of our brief on appeal, the allowance provided 22 years of coverage at year-end 2006, something like 35 years of coverage at year-end 2007. This was beyond a robust allowance. And please bear in mind, under the accounting literature, the allowance is not to be used as a cushion or a safety net for future losses. It is only permitted to be booked for losses that have actually been incurred as of the balance sheet date. They may not have manifested yet. Is he making an argument that there was no falsity? Correct, Your Honor. That's not what the district court found. It certainly didn't find it. It didn't deal with it either way. Correct. The district court said even assuming there was falsity, there was either a lack of subjective knowledge or no scienter. That's correct, Your Honor. But with respect to the evidence that we have in evaluating his argument about our scienter, what we know is that the year-end financial statements, the year-end allowance was never restated, that there were five joint examinations conducted by the Feds, by the FDIC and by the state examiners, that in the course of doing that, they of course looked at the allowance, that they did not require any restatements of the year-end allowance. Again, for me it's not helpful to say why they couldn't prove their case. We're looking at the pleadings. The pleadings say you made a number of egregious mistakes that may or may not be accurate, and because of those mistakes we ought to assume that you had the requisite scienter. That's what they seem to say. Tell me why the pleadings aren't sufficient to establish that. The pleadings establish exactly the opposite of that, Judge Hurwitz. The pleadings establish that Deloitte examined the allowance, that Deloitte examined the internal controls. This is an auditor who, far from sticking its head in the sand, reported significant deficiencies to the company and to the audit committee in 2006, 2007 and 2008. In light of those found significant deficiencies, as the complaint alleges, they expanded their audit procedures, they tested additional loans. What is it that the plaintiffs point to? And they had our work papers. What is it that they point to? They point to one loan, an $8 million loan, and they say that the Deloitte work paper said that there might, this is on a $2 billion portfolio, so there's no showing that it's material at all. But even with respect to the loan that they choose, and it's the only one that they choose, on that $8 million loan the most that they say is the Deloitte work paper say they might take a haircut when they go to sell the property. That doesn't bear on the question of whether the bank is going to suffer a loss. Tell me more about how big is the haircut? What kind of, does it mean that there will be a loss? There are individual borrowers who are still responsible for the loan. No indication whatsoever that there's going to be a loss on that loan. And certainly not any kind of a loss that suggests that the allowance on a $2 billion portfolio is somehow misstated or fraudulently misstated. It's the opposite of burying your head in the sand. In 2007, Deloitte found a material weakness, which is a serious finding. They go to the company and to the board of directors, the audit committee of the board of directors, and they report a material weakness. And as the district court properly found, Your Honor, that is the opposite of an auditor who sticks his head in the sand. And other decisions of this court and other courts have said, how can you claim that the auditor has no audit at all or an egregious refusal to see the doubtful when they go to the audit committee and they report a material weakness? Counsel, Judge Gould, if I can ask you a quick question, does TELABS bear on this case? I think it does, Judge Gould. I think TELABS, as the district court found, required the district court to weigh competing inferences, alleged fraudulent and nonculpable inferences. And the court, looking at the facts which have been alleged in the Third Amendment complaint, Judge Gould, and that I was just discussing with Judge Hurwitz, found that those facts give rise to the opposite set of inferences, nonfraudulent inferences, that this was an auditor that was very focused on this audit client, expanded its audit procedures in light of its findings, and concluded on the basis of the additional testing that the allowance was properly stated for the three year ends, 2006, 2007, and 2008, for which it was responsible. And again, in doing so, made a finding that was completely consistent with what the regulators themselves found. The restatement that my opponent refers to was in June of 2009, after the audited financial statements at year end 2008. It did not pertain to those financial statements, and it was a restatement which was not audited by Deloitte. It came afterwards, and it was also in the amount of roughly $65 million. And it's not the $225 million or whatever that they make up, and they then claim is evidence of magnitude and duration such that there's evidence of cyanar. Is the cyanar test such that it encompasses subjective falsity? In other words, one of the issues that's raised on appeal, and it doesn't really matter if there is cyanar, but do you have to show subjective falsity separately from cyanar, or is it part of cyanar? That's a great question, Judge Horowitz. In our submission, as you know from our brief, we believe, as Judge Carney found, that subjective falsity is an independent basis for affirmance by this Court, and frankly, the Court could affirm without reaching the cyanar question, because Judge Carney's opinion is grounded on two findings, that the plaintiffs failed to allege misrepresentation, subjective falsity, and failed to allege cyanar. Well, subjective falsity is a little bit different than misrepresentation. I mean, they failed to allege sufficiently that you knew that anything you're saying was false. Under 10b-5, as Your Honor knows, there's falsity and there's cyanar, and he used misrepresentation as falsity. And so, yes, it is a completely different... Can you act with cyanar if the representations are, you don't believe the representations to be false? The test for cyanar embraces both conscious conduct and deliberate disregard or reckless conduct. Now you're getting to the question that I was trying to focus on, but doesn't the test for subjective falsity also focus not only on actual knowledge, but recklessness in ignoring facts? And that's what I was saying, Judge Hurwitz, is a great question. That is the great outstanding question in our submission post-Omnicare, where the claim is that there's an affirmative misstatement of an opinion statement, that the Supreme Court has made clear that the plaintiff needs to allege facts that would show that the belief was not sincerely held, which in our submission means that you would need to show consciously that you know you're stating an opinion that you yourself do not believe. That is certainly, if I'm right about that, that is a higher standard than a recklessness standard under cyanar. That's why it does matter. That's why they're not the same. This Court, of course, should decide that issue, in our view, on a full record. That's a very serious question. What is the relationship between subjective falsity and cyanar in a 10b-5 case, particularly as applied to auditors? That's a very important question for this circuit. But you think not posed by this case, or not necessary for the decision in this case? Well, what I would suggest, and what we say in our briefs, and we believe this is controlled, by the way, by Weston v. Lockheed, a 1989 decision authored by Judge Thompson, where Judge Carney found an independent basis to dismiss the case on subjective falsity. The other side has not appealed that. And under Weston, in our view, this Court doesn't need to reach cyanar, should affirm on the basis of an independent ground that was ruled on by the district court, and not appealed in this case. So, yes, we believe that it absolutely provides an independent ground. So, as I understand, your position is that they never separately challenged the district court's finding that they hadn't adequately pleaded subjective falsity, because they think it's bound up in the same test as cyanar, but you think it is a separate test. That is correct, Your Honor, and if you take a look at the issue that they present, the issue they present is limited to cyanar, whereas Judge Carney's opinion obviously has both cyanar and misrepresentation. And again, this is a very important question. When counsel stood up here, he once again conflated subjective falsity with cyanar. They aren't the same. Some panel of this Court probably at some point will need to dissect what the relationship is between subjective falsity as an element of falsity in the opinion statement context and cyanar in the 10b-5 context, and particularly as against accountants. Those are very complicated and important issues, but they waived and abandoned that issue because they never appealed the misrepresentation slash subjective falsity holding. And that is an independent basis, as this Court said in Weston. In Weston, they didn't appeal the state secret doctrine. In Weston, it's a two-page decision. Judge Thompson said, you know, we're not going to pass on the sufficiency of the district court's ruling on the state secret privilege because you didn't appeal it. So the district court might have been right, the district court might have been wrong, but it's an independent basis, and that's how we're going to decide this appeal. Thank you, Your Honor. We certainly did argue the issue below as to whether subjective falsity is required. We argue it in our opening brief here. We leave with the cyanar standard applicable and held by this Court to apply in the New Mexico investment case. The substantive question is whether subjective falsity standard applies to an auditor-certified financial statement. This Court has never held that it does. The district court relied on Rubkey. Rubkey concerned a fairness opinion. We agree that fairness opinions and legal opinions are governed by a subjective falsity standard, and they have been since Virginia bank shares. But this Court has never held that a subjective falsity standard applied to an independent auditor-certification of a financial statement. The second circuit has, but that appears to be contrary to the law of this circuit. Well, if we've never held it, how could it be contrary? I said the Court has never held that subjective falsity is required, and it appears to be contrary to the reckless standard that's described in New Mexico investments. And we note that at least one district court in this circuit has held that subjective falsity is required. Subjective falsity does not apply to an independent auditor's financial statements, and the sixth circuit has held that as well in the Omnicare case. And the Supreme Court in Omnicare also, the Omnicare Supreme Court case concerns a legal opinion. It doesn't concern independent auditor-certification of financial statements. Omnicare doesn't change the law at all as to what constitutes an opinion. Let me ask one other opinion, one other point. The most important figure is $825 million, and that's not made up by a plaintiff's lawyer. That's KPMG reporting to the FDIC as to how much the FDIC is on the hook for. And the numbers that we do come up with as to what the loan loss reserve should have been along the way, those were calculated by a forensic accountant that we hired to go through the work papers. They're not made-up numbers. Thank you.
judges: Kozinski, Gould, Hurwitz